UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE P. CLEM-ADAMS,

                Plaintiff,                    Case No. 05-74116

vs.

                                      DISTRICT JUDGE ROBERT H. CLELAND
JO ANNE B. BARNHART,                MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION

## I.    BACKGROUND

       Diane P. Clem-Adams brought this action under 42 U.S.C. §405(g) to challenge a final

decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under

Title II of the Social Security Act.  Both parties have filed motions for summary judgment which

have been referred for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B) and (C).

For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be

DENIED and Defendant's motion for summary judgment be GRANTED.

### A.    Procedural History

       Plaintiff filed an application for DIB on May 17, 2002, alleging disability beginning April

15, 2002, due to left knee pain, neck problems, arthritis in the right hand, Crohn's disease and

depression (R. 46-48).  Plaintiff's application was denied initially, and following a hearing

before Administrative Law Judge B. Lloyd Blair (ALJ) (R. 13-20).  She was born July 6, 1957 (R.

46)  and was 47 at the time of her hearing.  The Appeals Council denied Plaintiff's request for

review (R. 5-7).

### B.    Background Facts

1.     *__Plaintiff's Application__*

In Plaintiff's May 19, 2002, Disability Report she describes her disability as being a herniated disk at C-5 and C-6, Crones disease and asthma[1] (R. 62).  She indicated that the pain, which worsened with lifting or constant moving, caused her to work fewer hours and change her job duties.        On June 21, 2002, she reported that lifting over five pounds resulted in neck pain and that when she was required to lift too much she had to leave work early (R. 90).  The pain started in June 1996 as a result of a 50 pound bag of dog food being dropped into her arms (R. 91).  The pain from the initial injury subsided, but lifting exacerbated the problem.  The pain was described as a aching, throbbing constant pain that started in her neck and radiated down her arms.  The pain worsened with lifting, riding for long periods in a car, sitting for long periods and curling her hair.  Ice and pain pills  reduced the pain (R. 91-92).  Her condition did not affect her ability to walk or climb stairs (R. 92-93).  She could lift and carry five pounds and had no limitations in her arms or hands or with sitting or "other limitations" (R. 93).  She had not been given any limitations by her doctors (R. 94).[2]  She could do her own shopping (grocery and clothes) without resting, and this typically took her 45 minutes.  She had trouble carrying laundry and groceries, so her husband assisted with these tasks.  She also did dusting, child care, cooking, mopping and washing dishes.

On October 30, 2002, Plaintiff filed her Request For Hearing stating that she could not do

---

[1] Plaintiff indicated in an undated form that she had not had any recent asthma attacks and had not been treated for asthma since she was five years old (R. 96).

[2] The record indicates that on March 13, 2003, neurological and reconstructive spine surgeon, Dr. Akram Mahmoud, D.O., did recommend a work restriction of no lifting over 30 pounds, and minimal repetitive motion and twisting (R. 223).

"household chores like sweeping floors, mopping, standing doing dishes. The pain is very severe most of the time" (R. 35). In an undated form Plaintiff indicates that, since the date she requested a rehearing, her condition changed in that she lost strength in her left hand, could no longer do household chores and was no longer working (R. 98). She reported having seen 13 treators since the date of her request for reconsideration (R. 99, 100, 101).

### 2.    *Plaintiff's Hearing Testimony*

Plaintiff was 47 years old, five feet six inches tall and weighed 185 pounds at the time of the hearing (R. 264). She had completed ninth grade (R. 264-65). In her May19, 2002, Disability Report she noted a weight of 160 pounds ®. 61.)

Her most recent job was with Wendy's (R. 265). The position was full-time, she held it for a year and she was required to stand for the entire shift and lift a maximum of 50 pounds. Before this she worked at Sam's Club part-time. She also held this position for one year and was required to stand for the entire shift and lift up to 75 pounds (R. 265-66). Before this she worked part-time for one and one half years at Sheridan Books, a position which also required constant standing and lifting up to 50 pounds (R. 266). Before this she worked for ten years at Meijer's (starting as part-time and then full-time), a position which also required constant standing and lifting up to 50 pounds (R. 266-67).

She testified that her inability to work was a result of a left knee problem, herniated disc in her neck, right hand arthritis, Crohn's disease and depression (R. 267). The problems with her neck began in 1986. She tried physical therapy up until June 2004, but this only made the problems worse (R. 267-68). Surgery had been ruled out due to her Crohn's disease (R. 268). The pain was constant and traveled down her left arm and the middle of her back. She described the pain as 10/10.

3

She took Vicodin for pain without side effects (R. 268-69).

The pain in her left knee began in February 2004 (R. 269). She had surgery in April or May 2004, which helped for one month. Her knee swelled, requiring ice, and constantly ached and throbbed. She described her knee pain as 8/10.

She began having problems with her right hand in February 2004, which she claimed Dr. Faro diagnosed as arthritis (R. 269-70).

She was diagnosed with Crohn's disease in 1996 (R. 270). She was hospitalized for three days in March 2004 for a "Crohn's attack", and suffered another attack in June but was not hospitalized.

She was diagnosed with depression in 1996 (R. 271, 270). She was being treated by Edward Humanay, whom she visited monthly (R. 270-71). She was never hospitalized for depression and her family doctor prescribed Wellbutrin XL (R. 271).

She used to cook, but at the time of the hearing could do very little. She did not do laundry, vacuum, do yard work or shop for groceries (R. 271-72). She did visit family and friends and watched her nephew and daughter's sporting events (R. 272). She could comfortably lift two pounds, stand three to four minutes, walk one city block and climb stairs. She could "somewhat" bend over and pick up a dollar, but could not squat (R. 272-73). She went to bed around 11:00 p.m., was up and down all night, and got up for the day at around 6:00 a.m.

Her typical day consisted of making coffee, sitting to watch the news, going to doctor's appointments, reclining in a chair until her family returned, going out to eat, and reclining a chair until she went to bed for the night (R. 273).

4

**3.** *__Medical Evidence__*

A November 7, 1996, cervical spine magnetic resonance imaging (MRI) revealed a large herniated disc at C5-C6 (centrally with parasagittal extension to the left all the way out into the nerve root canal and foramin) a very small central herniated disc at C6-C7 (R. 105, 198).

On June 18, 2002, Plaintiff was injured in a car accident in which her car was hit from behind (R. 117).  On June 26, Plaintiff was examined by Paul Olejniczak, M.D., a physiatrist ®. 117-18).  Plaintiff complained of midline neck pain with occasional left shoulder pain (R. 117).  Her symptoms were worse with lifting, lying down and with use of heat.  She had a past history of cervical herniated disc from 1996, which was resolved with physical therapy and chiropractic care. Dr. Olejniczak reported that Plaintiff had limited range of motion of her cervical spine with complaints of discomfort with all motions.  Dr. Olejniczak noted tenderness to palpation over Plaintiff's low cervical spine and over her left upper trapezius muscle group.  He diagnosed neck pain associated with the motor vehicle accident and suspect cervical strain, and referred Plaintiff for physical therapy (R. 118).

During a July 3, 2002, visit Plaintiff reported to Dr. Olejniczak that driving in a car bothered her neck (R. 115).

 A July 12, 2002, cervical spine MRI revealed degenerative disc disease at C5-C6 and C6-C7 and borderline spinal stenosis at C5-C6 (R. 114, 197).

On July 26, 2002, Dr. Olejniczak noted that Plaintiff was complaining of neck pain and tightness radiating into her left arm (R. 113).  Plaintiff reported that she "poorly tolerated" sweeping the day before.

On July 30, 2002, Plaintiff had a normal left upper extremity electromyogram (EMG) (R.

5

110, 242). Dr. Olejniczak concluded that there was no evidence of left cervical radiculopathy, left brachial plexopathy or left ulnar neuropathy at the wrist, and recommended continued physical therapy and reevaluation in two weeks. Plaintiff participated in a course of physical therapy from June 2002 to August 2002 (R. 106-09). In her last visits she reported that pain relief after physical therapy lasted 45 minutes to 1 ½ hour (R. 106).

On August 14, 2002, Plaintiff reported to Dr. Olejniczak that she was experiencing pain across the tops of her shoulders and, when sweeping, pain in her neck, mostly on the right (R. 107). She also reported trouble sleeping. Dr. Olejniczak recommended she continue physical therapy twice a week for two weeks.

On September 30, 2002, Plaintiff was examined by Akram Mahmoud, D.O., a neurological and reconstructive spine surgeon (R. 227-28). Dr. Mahmoud reported that Plaintiff had decreased range of motion of her neck and sensory was decreased in the cervical spine. Dr. Mahmoud diagnosed Plaintiff with cervical disc herniation at C5-C6 and C6-C7 and small disc herniation at C7-T1 and prescribed Darvocet. He restricted Plaintiff from working until her next office visit (R. 228, 236).

Also on September 30, a state agency physician reviewed the medical evidence of record (R. 120-27). The reviewer opined that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently and stand, walk or sit for six hours in an eight-hour workday (R. 121). She was also limited to work which did not require climbing ladders, ropes or scaffolds (R. 122). The reviewer found Plaintiff's allegation that she could lift only five pounds was partially credible due to her daily activities (R. 125).

On November 6, 2002, Plaintiff reported to Dr. Mahmoud that her last pain injection had

6

made her pain worse and that she had not gone for further injections because she had been told she would not benefit (R. 225). Dr. Mahmoud recommended that she continue the conservative pain management, including cervical epidural injections. He referred her to Dr. Richard Ferro for the injections and Dr. John Jerome, a clinical psychologist, and recommended that she remain off work (R. 225, 232).

A December 11, 2002, left arm EMG testing was normal without definite electrodiagnostic evidence of left cervical radiculopathy or neuropathy (R. 237).

On December 23, 2002, Dr. Mahmoud discussed the results of Plaintiff's latest MRI, which showed cervical disc herniation with osteophyte complex resulting in spinal stenosis at C5-C7 (R. 224). He referred Plaintiff to Dr. Ferro for pain management and, if this failed, he stated he would consider surgical intervention. Dr. Mahmoud recommended Plaintiff remain off work until she returned in eight weeks (R. 224, 230).

On December 24, 2002, Richard S. Ferro, D.O., a pain specialist, evaluated Plaintiff (R. 135). He noted "[e]mployment status works part time no restrictions" (*Id.*). On March 13, 2003, surgeon Dr. Mahmoud again saw Plaintiff and noted she was 50% better (R. 223). He opined that she could return to work in six weeks with restrictions including no lifting over 30 pounds and minimal repetitive motion and twisting restrictions. Plaintiff appeared to be in no acute distress. Plaintiff's cervical range of motion was intact with mild pain or both flexion and extension. Reflexes were intact and symmetric, hand grasp and grip strength was intact and symmetric, and her cranial nerves were intact. Dr. Ferro diagnosed post traumatic cervicalgia with radiculopathy and recommended facet blocks and epidural injections, as well as physical therapy and behavioral and cognitive services.

7

On December 26, 2002, Plaintiff complained of neck pain radiating into her left arm (R. 147). Dr. Ferro noted cervical spine tenderness at C3-C4 and C7-T1, with intact range of motion and mild left arm and shoulder pain with extension and flexion, intact lower extremity function. Dr. Ferro administered an epidural injection.

On January 9, 2003, Plaintiff complained of left-sided neck pain radiating into her shoulder and arm (R. 146). Dr. Ferro found cervical spine tenderness at the left side of C5 through T3, with intact range of motion and mild neck and shoulder pain with extension, intact upper extremity function and tenderness in the trapezius, suprascapular and deltoid muscles. X-rays showed degeneration of C5-C6 worse than C6-C7. Dr. Ferro administered an epidural injection.

On February 3, 2003, Plaintiff complained of left-sided neck pain radiating into her shoulder, with primary pain in her left shoulder (R. 145). Dr. Ferro noted cervical spine tenderness at C3-C4 and C7-T1, with intact range of motion and mild left shoulder pain with extension, intact upper extremity function and tenderness in the trapezius, suprascapular and deltoid muscles. Plaintiff reported 50% pain control with pain clinic treatment. Dr. Ferro administered an epidural injection.

On February 18, 2003, Plaintiff complained of neck pain radiating into her shoulders (R. 144). Dr. Ferro noted cervical spine tenderness at C3-C4 and C7-T1, with intact range of motion and mild shoulder pain with both flexion and extension, intact upper extremity function and tenderness in the trapezius and medial rhomboideus muscles. Dr. Ferro administered an epidural injection.

On March 13, 2003, surgeon Dr. Mahmoud again saw Plaintiff and noted she was 50% better (R. 223). He opined that she could return to work in six weeks with restrictions including no lifting over 30 pounds, and minimal repetitive motion and twisting.

8

On March 20, 2003, Plaintiff saw Dr. Ferro with neck pain extending to her shoulders (R. 142).   Examination revealed cervical tenderness, intact cervical range of motion, mild pain with extension toward neck and shoulders, intact upper extremity function with no lateralized deficits and a pattern of pain along the suprascapular, deltoid and trapezius muscles (left greater than right).   Past diagnostic studies indicated disc changes in C5-C6, C6-C7 and C7-T1, with C5-C6 being the primary level of degeneration and bulging.   Dr. Ferro administered bilateral cervical facet blocks.

On April 11, 2003, Plaintiff reported right-sided cervical pain (R. 163).   Dr. Ferro's examination revealed cervical tenderness, intact cervical range of motion and mild pain with flexion and extension. Plaintiff's upper extremity function was intact with lateralized deficits and mild pain extending to her shoulder.   The trapzius, suprascapular and deltoid muscles were tender bilaterally. Dr. Ferro administered rhizotomy with radiofrequency on the right side.

On April 24, 2003, Dr. Mahmoud evaluated Plaintiff regarding her cervical spine pain (R. 158).   She reported difficulty lifting or moving items at home, as well as conducting personal hygiene or holding a gallon of milk.   She had not been working due to pain.   Physical examination revealed no changes.   Dr. Mahmoud recommended that she remain off work until see saw Dr. Ferro again and that she undergo a "work hardening program" to evaluate her functional capacity (R. 158, 243).   Dr. Mahmoud explained that he was closing his practice and Plaintiff would be treated br Dr. Ferro and Dr. Rosenberg (R. 158).   Dr. Mahmoud completed a form indicating that Plaintiff could not return to work until further evaluation by Dr. Ferro (R. 221, 243).

On April 30, 2003, Plaintiff visited a pain clinic and was evaluated by John A. Jerome, Ph.D. (R. 128).   He noted that Plaintiff was not working and was being paid wage-loss due to the auto accident.   Her husband was being paid to do household chores in her place.   Dr. Mahmoud had lifted

9

his restrictions and indicated that she could return to work on February 10, 2003, with a 30 pound lifting restriction and no repetitive twisting or turning. Dr. Jerome noted that "they are wanting us to fill out a restrictions forms and approval for her husband to continue to be paid". Plaintiff was taking 750 milligrams of Vicodin eight times per day. She also reported that she had an injection with 50% relief. Dr. Jerome noted that Plaintiff had a "lot of personal problems", including her eight year old daughter's Crohn's disease and being widowed in her second marriage (her current husband attended the appointment with her). She cried throughout the session. She reported that Prozac, Paxil and Wellbutrin had provided no benefit. Dr. Jerome stated that he would not treat her as a psychologist because she had prior therapist and she said she would go back to the treator. He ordered a functional capacity evaluation and stated that they would "deal with restrictions" after the results were submitted. He diagnosed her with substantial clinical depression (R. 129).

On May 1, 2003, Plaintiff visited Dr. Ferro complaining of pain in the left side of her neck (R. 141). Examination revealed tenderness in the cervical spine, intact cervical range of motion, mild pain with flexion and extension in neck, intact upper extremity with no lateralized deficits and a pain pattern extending along the 5-6 distribution. Dr. Ferro noted that physical therapy, pain medications and pain clinic therapy had not helped, but the a pain clinic facet block had provided 50% pain control for multiple weeks. Dr. Ferro administered rhizotomy with radio frequency on the left, noting that a previous treatment had the right side pain controlled. On May 6, 2003, Dr. Ferro completed a form indicating that Plaintiff was disabled from work until May 29, 2003 (R. 131).

On May 27, 2003, Plaintiff's functional capacity was evaluated by Rosalie Bellingar, M.S., an occupational therapist (R. 200-09). Ms. Bellingar reported, based on the tasks performed by Plaintiff, that she should be restricted to working at the sedentary exertional level, due to her

"inability to participate in most of the functional capacity evaluation tasks secondary to high levels of pain" (R. 200).   Her exam summary indicated an average grip strength for two positions of 9 and 5 pounds on the left, 41 and 12 on the right with an average arm lift capacity of 14 pounds (R. 207 & 206).  Ms. Bellingar noted that the DOT definition of sedentary work requires a person to lift 10 pounds occasionally (0-33% in an eight hour workday). Ms. Bellinger indicated that Plaintiff had only been able to lift 10 pounds for one repetition and Plaintiff had reported pain of 10+/10 during the task, became tearful and reported swelling in her neck.  A form for Plaintiff's auto insurance was completed this same day, but the signature is illegible (R. 132).  The doctor indicated that Plaintiff could vacuum and wash floors with limitation, could not mow the lawn, rake leaves or shovel snow, and could sweep, dust, do laundry, cook, do dishes, clean bathrooms, provide child care, wash windows and take out garbage without limitation.  The doctor also indicated that she was limited to sedentary physical work and could lift 10 pounds two-three hours per day.

On May 30, 2003, Plaintiff visited Dr. Ferro complaining of neck pain radiating into her left shoulder and arm (R. 137).  Dr. Ferro noted that the rhizotomy pain treatments had helped, but made her skin feel sunburnt and helped more on her right side.  Dr. Ferro suggested anti-inflammatories, but Plaintiff was sensitive to anti-inflammatories, so she received an epidural injection.

On June 6, 2003, Plaintiff visited Dr. Ferro complaining of neck pain radiating into her left shoulder (R. 140).  Dr. Ferro noted mild tenderness in the cervical spine, intact cervical range of motion, mild pain with flexion and extension of shoulder and neck (left greater than right), tenderness along suprascapular and deltoid muscle to the left, no upper extremity pain, no lateralized weakness.  Dr. Ferro noted that pain medications, pain clinic treatments and physical therapy had not helped and administered an epidural injection.

On July 28, 2003, Plaintiff visited Dr. Ferro complaining neck and bilateral shoulder pain (greater on left) (R. 139). Upon examination Dr. Ferro found mild bilateral cervical tenderness (left greater than right), intact cervical range of motion, mild pain in left shoulder and arm with extension and no changes in hand grasp, grip strength or motor system. Plaintiff reported that the last epidural injection had provided 50% pain relief for two and one half weeks. Dr. Ferro administered another epidural.

On August 26, 2003, Plaintiff underwent an independent medical evaluation with Joseph Salama, M.D., an orthopedic specialist, at the request of her insurer (R. 215-19). Dr. Salama reported that Plaintiff had good range of motion of her neck in all planes. Dr. Salama diagnosed degenerative disc disease of the cervical spine which was temporarily aggravated by the motor vehicle accident in June 2002 (R. 218). Dr. Salama opined that Plaintiff's injuries from the auto accident required conservative treatment including physical therapy, and treatment was not reasonable beyond three months. Dr. Salama opined that while Plaintiff required no work restrictions resulting from the accident, her underlying neck impairment required a restriction to sedentary work, lifting no more than 10 pounds and performing no work above waist level (R. 219).

On September 3, 2003, Dr. Jerome indicated that he had consulted with Plaintiff's primary care physician, Dr. Rosenberg, and her pain anesthesiologist, Dr. Ferro (R. 134). Her Vicodin had been reduced to six a day and she was placed on Effexor for depression. She was directed to physical therapy and was receiving epidural injections for pain. He did not set further appointments, as Plaintiff and her husband indicated that she seeing improvement with counseling she was receiving "elsewhere".

.        On September 4, 2003, Plaintiff underwent an evaluation with Lawrence Eilender, M.D., an

12

internist and neurologist, at the request of Plaintiff's insurer (R. 210-14).  Plaintiff complained of neck pain radiating into her left arm (R. 211).  Dr. Eilender's examination of Plaintiff's neck revealed moderate spasm noted on palpation over the posterocervical region (R. 213).  Plaintiff reported mild pain on palpation over the left anterior shoulder when compared to the right.  Plaintiff had normal 5/5 strength in her upper and lower extremities and normal sensation to pinprick (R. 212).  Dr. Eilender diagnosed Plaintiff with cervical strain, myofascial spasm, and possible thoracic outlet syndrome in the left upper extremity which could be post-traumatic (R. 213).

On September 15, 2003, Plaintiff visited Dr. Ferro complaining of neck pain extending to her shoulders and arms (left greater than right) (R. 138).  Dr. Ferro noted tenderness in the cervical spine, painful range of motion in neck and shoulders, no lateral deficits in the upper extremities and no changes to either extremity (though there was pain following dermatomes on the left).  Dr. Ferro concluded that treatment history had been conservative and unsuccessful, and even epidural injections only reduced pain 30% for multiple weeks.  He provided an epidural injection and indicated that, if unsuccessful, further options would be evaluated.

On September 26, 2003, Dr. Ferro noted cervical tenderness, intact range of motion, mild pain in shoulders and neck with flexion and extension and no lateral deficits in upper extremity (R. 136).  He noted that treatment thus far had been conservative and unsuccessful and both physical therapy and pain management treatments had aggravated her pain.  He discussed the fact that Dr. Salama and Dr. Eilender were recommending a vascular study to rule out thoracic outlet syndrome, which he did not believe was present, and that Plaintiff's Vicodin would continue to be reduced as her anti-depressant was increased.

From September 2003 to January 2004, Plaintiff participated in a course of physical therapy

13

(R. 189-194).  Her final evaluation indicated that she had made significant gains with her physical therapy attaining all of her short term goals and progressing toward her long term goals (R. 189). Plaintiff had decreased tenderness on the para-cervical area, decreased cervical pain, increased range of motion of the cervical spine and increased cervical muscle strength.   However, she was discharged secondary to non-compliance with her physical therapy sessions.

On February 23, 2004, Plaintiff was examined by Paul Kenyon, M.D., an orthopedic surgeon (R. 178).  A February 27, 2004, left knee x-ray was negative (R. 173).  An MRI of the left knee demonstrated oblique tear involving the posterior horn of the medical meniscus; osteochondritis dissecans, osteonecrosis involving the distal femur in the subchondral region in the midline anteriorly; and mild chondromalacia of the patella medially (R. 172).  On April 31, 2004, Dr. Kenyon reported that Plaintiff's left knee had trace effusion and she had pain along the medial joint line with McMurrays. Dr. Kenyon diagnosed Plaintiff with osteochondritis with torn medial meniscus and chondromalacia and recommended a knee arthroscopy.

March 22, 2004, abdominal and chest x-rays revealed a partial small bowel obstruction (R. 171).

On April 27, 2004, Dr. Ferro reviewed plaintiff's treatment for symptoms of pain, concluding that her conservative course of treatment had been unsuccessful in offering sustained relief of Plaintiff's symptoms (R. 176).  Dr. Ferro diagnosed chronic intractable post traumatic cervicalgia with radiculopathy and recommended dorsal column stimulation, which he believed offered good potential for long-term relief.  Plaintiff was to discuss the treatment with Dr. Jerome and Dr. Ferro.

On April 31, 2004, Dr. Kenyon reevaluated Plaintiff's left knee pain (R. 177).  Physical examination revealed trace effusion, pain along medial joint line with McMurrays but no click,

14

intact ligaments and pain with patellofemoral compression. Dr. Kenyon diagnosed osteochondritis with torn medial meniscus and chondromalacia and recommended a knee arthroscopy. There is some indication in the record that an arthroscopy may have been performed by Dr. Kenyon on May 4, 2004 (R. 195).

On June 10, 2004, Plaintiff reported, apparently to Ted M. Faro, D.O., that she was still experiencing cervical pain, but it had changed and "from time to time it lightens up" (R. 184). She described her pain and depression as 8/10.[3]

### 4. *Vocational Evidence*

Heather Benton served as the vocational expert (the "VE") in this matter (R. 274).

VE Benton classified Plaintiff's past work, *as performed by Plaintiff*, as

- Wendy's  - medium exertional unskilled
- Sam's Club - heavy exertional, unskilled
- Sheridan Books - medium exertional, semi-skilled
- Meijer - medium exertional, unskilled

®. 275-76).[4]

The hypothetical posed to VE Benton by ALJ Blair was as follows: a hypothetical person who could meet the demands of light work, but who should never use ladders, scaffolds or ropes; who should avoid walking on uneven surfaces; should never use vibrating, pneumatic or power

---

[3] The record also contains some evidence that was submitted only to the Appeals Council. A district court may not consider evidence first submitted to Appeals Council; but, on showing of good cause, may remand for administrative consideration of the evidence. *Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993). Because Plaintiff has presented no argument for remand based on this new evidence, this evidence was not considered.

[4] VE Benton explained that she had originally classified all the jobs as "light" exertional, pursuant to the Dictionary of Occupational Titles' definitions, but Plaintiff's testimony regarding the lifting requirements she encountered increased the "as performed" classifications as indicated.

tools; who should only have simple unskilled work with an SVP of 1 or 2; should have work that does not require her to read, calculate, compute, problem-solve or reason; and should not have work that required concentration, detail or precision tasks (R. 276).   VE Benton testified that this hypothetical person could perform Plaintiff's past work as a fast-food worker, sales attendant and/or cashier, as these jobs are described in the Dictionary of Occupational Titles (DOT), and not as Plaintiff described they had actually been performed.

ALJ Blair next asked VE Benton to consider whether there would be a significant number of jobs in the regional and national economy the hypothetical person (with the above limitations and possessing the same vocational profile as Plaintiff) could perform.  In response to which VE Benton provided the following light, unskilled positions:   inspector (10,000), sorter (2,400), cleaner (15,100), assembler (30,000) and others (R. 277).

If Plaintiff's testimony regarding pain, discomfort and limitations were taken as truthful, VE Benton testified that she would be unable to complete her past work or any work available in the regional or national economy (R. 277).

### 4.   *The ALJ's Decision*

ALJ Blair found that Plaintiff met the disability insured requirements of the Act through the date of the decision, and that she had not engaged in substantial gainful activity since the alleged date of disability onset (R. 19).

Plaintiff' degenerative disc disease, osteochondritis dissecans of the left knee, affective disorder and Crohn's disease were considered severe (R. 19).   The severity of the claimant's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing").

16

Plaintiff's allegations regarding her limitations were not fully credible.

Plaintiff had the residual functional capacity (RFC) to lift or carry a maximum of 20 pounds and 10 pounds frequently. In an eight-hour workday she could stand, walk and sit for six hours. She could never use ladders, scaffolds, ropes or pneumatic, torque or power tools. She should avoid uneven surfaces and could do simple, unskilled work with a specific vocational preparation (SVP) rating of 1 or 2 in jobs that did not require her to compute/calculate, problem solve, reason or concentrate on detailed or precision work.

Plaintiff's past work as a fast food worker, cashier and sales attendant did not require work-related activities precluded by her RFC. Plaintiff was, therefore, not disabled (R. 20).

## II.   ANALYSIS

### A.   Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past

work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

## B.   Factual Analysis

In her motion Plaintiff enumerates multiple challenges to the Commissioner's decision, but her brief in support of the motion only contains legal arguments and/or factual allegations in support of one – the ALJ erred in determining that Plaintiff's subjective description of her pain and limitations were not credible.

This court does not consider issues that have not been fully developed by the briefs or in the record.  Issues that are adverted to in a perfunctory manner without some effort at developed argumentation are generally deemed waived.  *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir.2002).  Further, "[i]t is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . .  put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997).  Therefore, only issue of the ALJ's credibility determination will be addressed.

The Commissioner's regulation 20 C.F.R. §404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in

_____

[5] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

18

determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)). *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 852 (6th Cir. 1986); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001) ("Subjective complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.' ") (quoting 42 U.S.C. § 423(d)(5)(A)).

The Commissioner's regulations specifically state:

> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

29 C.F.R. §404.1529(c)(2).

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific. "[S]trict reliance on objective medical evidence is . . . contrary to the law of this circuit." *Beeler v. Bowen,* 833 F.2d 124, 127 (8th Cir. 1987). "An ALJ may not discount [subjective complaints] solely because of lack of objective medical evidence." *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985). The ALJ must say more than that the testimony on pain is not credible. *Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994).

Here, only the September 2002 state agency evaluator Dr. V. Sethy indicated that Plaintiff could perform at the median exertional level (R. 121). Yet, this opinion was based on limited data that does not consider the lengthy pain and other treatment provided in 2003 by Dr. Dr. Ferro and others. Nor does it factor in Dr. Ferro's conclusion in September 2003 that physical therapy, pain

19

medications and pain clinic therapy had not helped Plaintiff to the extent desired.   The May 2003 functional capacity evaluation by Rosalie Bellingar, M.S., an occupational therapist restricted to working at the sedentary exertional level requires a person to lift 10 pounds occasionally (0-33% in an eight hour workday) (R. 200-09). The August 26, 2003, independent medical evaluation with Joseph Salama, M.D., an orthopedic specialist, opined that with three months of physical therapy Plaintiff required no work restrictions resulting from the automobile accident, but her underlying neck impairment required a restriction to sedentary work, lifting no more than 10 pounds and performing no work above waist level (R. 219).   Thus, one would ordinarily anticipate an ALJ finding that the claimant with such RFC evaluations would be limited to sedentary work.  Yet, ALJ Blair determined Plaintiff could perform could perform a limited range of light exertional work, and thus could perform various of her past jobs as generally performed in the national economy, although not as they were actually performed by Plaintiff.[6]

Without a more current RFC or other report in the record showing Plaintiff could perform light exertional work nor a medical advisor testifying to such a capacity, an ALJ's finding of a capacity to perform light work is viewed with care, possibly even suspicion, by a reviewing court.

Yet, this is not a case where it appears the ALJ was trying to make a determination at step

_____

[6] 20 C.F.R. § 404.1565 [20 C.F.R. § 416.965 for SSI] states:

> ... We consider that your work experience applies when it was
> done within the last 15 years, lasted long enough for you to learn
> to do it, and was substantial gainful activity.

S.S. Ruling 82-61 permits a finding the claimant can perform the work or the past job as generally performed in the national economy.  This approach has been approved by many circuits.  For example, in *Studaway v. Secretary of HHS*, 815 F.2d 1074, 1076 (6th Cir. 1987), the court upheld a step four determination by the Secretary that plaintiff could perform his past work since he could do the same *type* of work as his past job.

20

four or based on a *light* exertional capacity in order to avoid a Medical Vocational Guideline ("Grid") determination at step five that the claimant is disabled at the *sedentary* exertional level. Here, Plaintiff, as a younger individual, would be found "not disabled" under the Grid even if she could only perform a wide range of sedentary work and not light work. The ALJ's finding that Plaintiff can perform her past work at the light level is based on his critical finding that her asserted degree of pain and other symptoms is not credible (R. 19). The two RFC findings that limited Plaintiff to sedentary work do not appear to have rejected her credibility on the limit of her abilities and the degree of her pain. Evaluator Bellingar did, however, note that Plaintiff's subjective pain rating of 9.5 -10 out of 10 prior to beginning the functional capacity evaluation and her presentation with very little bilateral strength was not consistent with her diagnosis (R. 204).[7] If there is substantial evidence to uphold an finding that discounts a claimant's credibility – and thus discounts her claimed limitations and level of pain – a court should defer to an administrative finding that the claimant has failed to carry her burden of demonstrating she cannot perform her past relevant work. Thus, while a court may have occasion to review with greater care a case such as this – with no RFC or medical source indicating a capacity to perform at a higher level than sedentary work – this is not a license to second guess an administrative credibility determination if it is supported by substantial evidence.

Because the ALJ was present during Plaintiff's testimony and could evaluate her demeanor, this Court must exercise a degree of deference added opportunity the ALJ had to evaluate credibility *Jones*, *supra*, 336 F.3d at 476.

---

[7] Ms. Bellinger noted plaintiff "reported an increase in pain to 10+/10" during the lifting tasks (R. 200).

The record in this case indicates that ALJ Blair did consider the subjective evidence presented by Plaintiff in support of her impairments and limitations, but found that there was substantial evidence to indicate that such was not supported by the objective medical evidence, her daily activities and other inconsistencies in the record (R. 17):

> The undersigned considered whether claimant's medically determinable impairment could reasonably be expected to cause disabling symptomology and concluded that they could. However, after careful consideration of the record, the undersigned finds that the claimant's testimony with respect to the extent and severity of her impairments and resulting functional limitations is not fully credible. The claimant testified she could lift two pounds but was able to lift 14 pounds during her functional capacity evaluation. The claimant testified her neck pain level is a 10/10 but reported to her physical therapist it was only a 5/10. The claimant testified she does a little cooking and shopping but reported earlier she went grocery shopping for 45 minutes, dusted, did child care, cooked, mopped and washed dishes. The claimant testified she could walk for one block but stated earlier her condition did not affect her ability to walk. The claimant testified she was diagnosed with right hand arthritis by Dr. Faro, but Dr. Faro's progress notes do not reflect that.

(R. 17) (citations omitted).

Plaintiff argues that each of ALJ Blair's articulated reasons for rejecting Plaintiff's credibility as insufficient.

### *Two Pound Lifting Limitation*

Plaintiff argues that functional capacity evaluation relied on by ALJ Blair to discount Plaintiff's testimony regarding her ability to lift only two pounds was insufficient because it was performed 1 ½ years before her testimony was taken and her condition could have progressed in this amount of time to the point where she could only lift two pounds. Yet, Plaintiff does not point to any objective medical evidence to show that the condition had so worsened. Ms. Bellingar's May 27, 2003, evaluation and report were well after te June 2002 automobile accident that might have aggravated her arm and shoulder impairment that began with the June 1996 dropped 50 pound bag

22

(R. 91). The evidence is somewhat equivocal on whether her condition may have improved since her functional evaluation. Dr. Ferro noting on more than one occasion that Plaintiff's physical therapy, pain medications and pain clinic therapy had not helped her, but that his pain clinic facet blocks had provided 30-50% pain control and improvement at times. Dr. Jerome in April 2003 confirming that Plaintiff reported an injection provided 50% relief. September 2003 to January 2004 physical therapy showed significant gains with her physical therapy attaining all of her short term goals and progressing toward her long term goals (R. 189). Plaintiff had decreased tenderness on the para-cervical area, decreased cervical pain from 9 of 10 down to 5 of 10, increased range of motion of the cervical spine and increased cervical muscle strength. It is curious why she was discharged for non-compliance with her physical therapy sessions when she seemed to be making progress. This factor may also have affected Judge Blair's credibility determination. Thus, Plaintiff's argument that she could lift less at the time of the hearing because of a deterioration in her condition is one a fact finder could reject where there is some evidence of improvement and Plaintiff's counsel has demonstrated no evidence that her condition worsened.

It is also significant that none of Plaintiff's treators or other medical sources restricted her to lifting less than 10 pounds, none indicated a belief she was totally disabled, and Dr. Mahmoud even believed at one time that Plaintiff would be able to return to work with a lifting restriction as high as 30 pounds. The last treator to support Plaintiff's inability to work was Dr. Ferro, who opined that she could return to work May 29, 2003 (R. 223). The record also suggests his treatment may have terminated before her late 2003 and early 2004 physical therapy indicated some improvement.

Plaintiff also argues that her testimony was not inconsistent with the functional evaluation, because she was asked what weight she could comfortably lift, to which she replied two pounds, and

Ms. Bellinger's functional evaluation summary notes that, although Plaintiff lifted 14 pounds, she did so with reported pain and could not lift over 10 pounds on any subsequent attempts. Yet, Ms. Bellinger opined that Plaintiff could perform sedentary work, which she acknowledged required lifting up to 10 pounds for up to 33% of a workday. Therefore, there was substantial evidence in the record to support ALJ Blair's determination that Plaintiff's statement that she could lift only two pounds was not credible.

### Cervical Pain Level

Plaintiff argues that ALJ Blair's reliance on her earlier statement to her physical therapist that the pain was 5/10 (R. 189) was misplaced because the statement had been made 11 months prior to the November 18, 2004, hearing, where Plaintiff testified that her pain was 10/10. Again, Plaintiff points to no objective medical evidence or even consistent statements made to her doctors to show that her condition worsened prior to the hearing. In fact, Dr. Ferro – clearly an expert on pain levels – regularly characterized Plaintiff's arm and shoulder pain with extension and flexion as "mild" – December 24, 2002, (R. 135); December 26, 2002 (R. 147); January 9, 2003,(R. 146); February 18, 2003, (R. 144); April 11, 2003, (R. 163); May 1, 2003, (R. 141); June 6, 2003, (R. 140); July 28, 2003, (R. 139). Again, he indicated the epidural injections provided 50% relief for a period of weeks. Therefore, there is substantial evidence in the record to support ALJ Blair's determination that Plaintiff's statement that her pain was 10/10 was not credible.

### Daily Activities

Plaintiff argues that ALJ Blair's reliance on the daily activities Plaintiff listed in her application and supporting materials was improper because the application had been filed more than two years prior to the hearing. She also points out that she had subsequently filed a form, which

although undated was clearly filed after her initial application was denied on October 4, 2002, indicating that her condition had changed and she had lost strength in her left hand and was no longer able to perform household chores.

Although there exists no objective evidence to support Plaintiff's claim that she lost left hand strength or that her condition deteriorated, in Plaintiff's subjective complaints to her multiple treators after her June 18, 2002, auto accident (R. 117), she did indicate that she experienced pain when sweeping (August 14, 2002) (R. 107) and had difficulty lifting, moving things, conducting personal hygiene and holding a gallon of milk (April 23, 2003) (R. 158). Yet the form in which Plaintiff reported her ability to perform the daily activities relied on by ALJ Blair was completed on June 21, 2002 – three days after her auto accident. The record also contains a May 27, 2003, form completed by a doctor which indicates that Plaintiff could vacuum with limitation and could sweep, dust, do laundry, cook, do dishes, clean bathrooms, provide childcare, wash windows and take out garbage (R. 132). There is also, as previously discussed, no indication from any treator or medical source that Plaintiff was restricted from completing daily activities.

This Court "must defer to an agency's decision even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir.2003) (internal quotation marks and citation omitted). We may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Therefore, while the record contains evidence that is not always consistent, it does contain substantial evidence to support ALJ Blair's determination that Plaintiff was not credible regarding her asserted limitations and degree of pain. He found her able to perform daily activities

25

which were inconsistent with her alleged disability. There is evidence in the record supporting ALJ Blair's credibility determination, and with that finding substantiated, there is nothing in the present record that provides a sufficient basis to disturb ALJ Blair's finding that plaintiff could perform a limited range of light work and certain of her past jobs as they are generally performed in the national economy..

### Arthritis Diagnosis

The last point of contention Plaintiff raised with regard to ALJ Blair's credibility determination, was his dismissal of Plaintiff's claim that she had arthritis in her left hand. ALJ Blair noted that there was no objective medical evidence to support this diagnosis and the record from Dr. Faro, the treator Plaintiff testified had made the diagnosis, did not contain any reference to such a diagnosis. Plaintiff argues that ALJ Blair's reliance on the one page of medical records included in the record from Dr. Faro is unfounded. Yet, Plaintiff bore the burden of proving that she was disabled. *See Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). She was required to present "complete and detailed objective medical reports of her condition from licensed medical professionals." *See id.* (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). Therefore, the fact that Plaintiff did not provide evidence of her alleged arthritis, even to the Appeals Council, undermines her argument. There is no objective medical evidence in the record from any treator to support Plaintiff's subjective testimony that she has lost strength in her left hand and has been diagnosed with arthritis. In fact, there are not any consistent complaints to treators to support this contention. Plaintiff often complained that her neck pain radiated to her shoulders and arms, but there are no complaints of arthritis-type pain. Therefore, ALJ Blair's determination that Plaintiff's complaint of arthritis was not credible must be upheld.

In sum, the is substantial evidence in the record to support the ALJ's credibility determination and, this being the only argument before this Court in opposition to the disability determination, ALJ Blair's determination that Plaintiff was not disabled should be upheld.

## III.   RECOMMENDATION

For the reasons stated above, It is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.   *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991).   Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.   *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

**Note:** any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.   Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.   The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

27

Dated: November 30, 2006                    s/Steven D. Pepe
Ann Arbor, Michigan                         United States Magistrate Judge


                        CERTIFICATE OF SERVICE

I hereby certify  that on November 30, 2006, I electronically filed the foregoing paper with the
Clerk of the Court using the ECF system which will send notification of such filing to the
following: James A. Brunson, AUSA, Barbara A. Murray, Esq., and I hereby certify that I have
mailed by United States Postal Service the paper to the following non-ECF participants: Social
Security Administration , Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago,
IL 60606


                                            s/ James P. Peltier
                                            Courtroom Deputy Clerk
                                            U.S. District Court
                                            600 Church St.
                                            Flint, MI 48502
                                            810-341-7850
                                            pete__peltier@mied.uscourts.gov


                                     28